UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Charles Perrone, on behalf of himself and all others similarly situated, | Court File No. _____ |
| | Class Action |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| Uponor, Inc., successor to Uponor North America, Inc., and Radiant Technology, Inc., | |
| Defendants. | |

Plaintiff Charles Perrone, on behalf of himself and all others similarly situated, by and through his undersigned counsel, brings this Class Action Complaint and states and alleges as follows:

## INTRODUCTION

1.     Plaintiff on behalf of himself and all other persons and entities similarly situated bring this action for and on behalf of the owners of homes and buildings with Uponor, Inc. ("Uponor") and/or Radiant Technology, Inc. ("RTI") plumbing systems with cross-linked polyethylene ("Pex") tubing as well as any person or entity who has paid for the repairs of or damage caused by such systems.  These systems are defective.

2.     Plaintiff and the putative Class have been damaged as a result of the design, development, advertisement, marketing, sale, and warranty misconduct of Uponor and RTI in connection with Uponor and RTI pex plumbing systems that utilize brass insert fittings.

3.     Uponor and RTI have sold brass insert fittings for pex plumbing systems throughout the United States.

4.      Uponor and RTI warranted and advertised that their pex plumbing systems with brass insert fittings had a lengthy warranty that expressly covered consequential damages arising from leaks or failures in the plumbing systems.

5.      Uponor and RTI have warranted and advertised their brass insert fittings as being "proven," "carefully engineered," "reliable" and resistant to corrosion.

6.      These representations, however, proved untrue and Uponor and RTI's brass insert fittings began to prematurely fail across the country.  These failures resulted in substantial damage to property other than the plumbing system.

7.      After selling these brass insert fittings across the country, Uponor now admits that the fittings are defective, unreasonably dangerous, and not merchantable.  Uponor and RTI, however, refuse to replace the plumbing systems of all persons and entities who own properties containing the admittedly defective fittings.

8.      The failures of the Uponor and RTI brass insert fittings have and will in the future cause water leaks.  These leaks have and will in turn cause extensive damage to other property including the homes and personal property of the owners.

9.      Plaintiff and the putative class members seek damages arising from and proximately caused by Uponor and RTI's breach of consumer protection statutes, fraud and misrepresentations, negligence, breach of contract and breach of warranties.  Plaintiff and the putative class members also seek declaratory and injunctive relief, as described below.

**PARTIES**

10.     Plaintiff and putative class representative Charles Perrone is a homeowner residing in Jamesville, North Carolina.  Mr. Perrone is a citizen of Jamesville, North Carolina.

11.     Plaintiff Charles Perrone brings this case on behalf of himself and a class of similarly situated persons and entities.

12.     Defendant Uponor, Inc. is a publicly-held entity that is in the business, among other things, of advertising, warranting, manufacturing, and selling plumbing components.

13.     Uponor, Inc. is the successor to Uponor North America, Inc. and is a Minnesota corporation that maintains its principal place of business in Minnesota.

14.     Defendant Radiant Technology, Inc.  is a foreign entity that is or was in the business, among other things, of advertising, warranting, manufacturing, and selling plumbing components.

15.     RTI is or was a wholly owned subsidiary or Uponor.  RTI is believed to currently maintain its principle place of business in Minnesota.

16.     Uponor and RTI are responsible for some or all of the acts and omissions alleged herein.

17.     Uponor and RTI have acted in concert with each other with the respect to the actions and omissions alleged herein.

18.     Uponor and RTI are jointly and/or severally liable to Plaintiff and the putative class members as joint venturers, or in the alternative, operate such that any pretend corporate formalities amongst and between the two should be disregarded or pierced, or in the alternative, are subject to an agency relationship, or in the alternative, are subject to predecessor and successor liability theories, or in the alternative, are otherwise jointly and severally liable for all acts and omissions alleged herein.

**JURISDICTION AND VENUE**

19.     This Court has jurisdiction over the parties, the proposed class, and the causes of action asserted herein pursuant to Rule 23 of the Federal Rules of Civil Procedure and 28 U.S.C. § 1332(d).  The amount at issue exceeds five million dollars ($5,000,000) and the controversy arises among citizens of different states.

20.     Venue in this forum is proper in that Uponor and RTI reside in Minnesota, some of the putative class members reside in Minnesota, the causes of action for the class representatives arose, in part, in Minnesota, the causes of action for putative class members arose, in part, in Minnesota, and Uponor and RTI transact business within Minnesota.

21.     Jurisdiction is also appropriate in Minnesota because the warranties provided by Uponor and RTI for their F1807 style fittings purport to require that suits be brought in Minnesota and that Minnesota law be applied to all tort, contract or other claims.

**FACTUAL ALLEGATIONS**

**Uponor and RTI Pex Plumbing Background**

22.     Uponor and RTI sell various plumbing products including pex plumbing systems and their components.

23.     Pex is an acronym for cross-linked polyethylene.  Polyethylene is the raw material and the "X" in the generic name "Pex" refers to the cross-linking of the polyethylene across its molecular chains.

24.     For decades, plumbers and homeowners used copper piping for potable water plumbing systems.

25.     Copper is and has been accepted by virtually all plumbing codes throughout the United States.

26.     In the 1980's, manufacturers in the United States began selling and plumbers began installing potable water plumbing systems with tubing made from polybutylene plastic.

27.     Plumbing systems using tubing made from polybutylene plastic were touted by manufacturers as being easier to install, cheaper and longer-lasting than copper plumbing systems.

28.     Polybutylene plumbing systems quickly proved to be poorly conceived, designed and manufactured systems.  Those polybutylene systems began to fail prematurely in the field causing substantial property damage.

29.     A substantial amount of litigation ensued as a result of the widespread, premature failure of polybutylene plumbing systems.  Several class actions were filed and settlements in those cases exceeded $1.25 billion.

30.     At least in part in response to the failure of polybutylene plumbing systems, virtually all manufacturers ceased manufacturing polybutylene plumbing systems for sale in the United States.  In addition, most plumbing codes eventually prohibited the installation of polybutylene plumbing systems.

31.     Following the demise of polybutylene systems, Uponor, RTI and other companies began selling alternative, non-copper plumbing products in the United States.

32.     Specifically, Uponor and RTI marketed and sold plumbing systems using pex tubing for use in residential and commercial settings.

33.     Uponor and RTI touted their pex plumbing systems as being easier to install, cheaper and longer-lasting than copper plumbing systems.

**Uponor and RTI Pex Brass Insert Fittings**

34.     In approximately 1997, Uponor and / or its parent company purchased RTI.  In doing so, Uponor purchased RTI's assets and liabilities, its entire product line, and the rights to RTI's intellectual property.

35.     Although RTI was previously involved only in the sale of radiant heating systems, after RTI was acquired by Uponor it began selling a pex plumbing system utilizing brass insert fittings that purportedly conformed to ASTM standard F1807.

36.     F1807 insert fitting systems typically use a crimp or stainless steel clamp connection design in which insert fittings made of brass alloy are inserted into the pex tubing. The brass fittings are secured by using a special tool that crimps copper rings or stainless steel clamps around the outside of the tubing, which in turn, creates a seal between the pex tubing and the brass fittings.

37.     The crimp and stainless steel clamp system design used by Uponor and RTI for their pex plumbing systems places a great deal of stress on the brass insert fittings when the system is assembled as intended.

38.     The design, choice of material and manufacturing methods of the F1807 brass insert fittings also result in residual stress within the fittings following the manufacturing process but before the system is assembled in the field.

39.     For some period of time, RTI sold the plumbing components and systems using the F1807 brass insert fittings under its own name or label.  However, employees of Uponor, RTI's parent company, also promoted, marketed and sold RTI systems to, for example, the manufactured structures market.  These fittings and systems were sold at least in part under the trade name "Plumb-Pex."

40.     On October 27, 2004, Uponor issued a press release that stated that it would close the RTI operations in early 2005.  In that press release, Uponor's executive vice president, Jim Bjork, promised that Uponor "will honor existing RTI and Plasco warranties."

41.     By December 2004, Uponor began receiving RTI's inventory, including brass fittings, and began handling the ongoing purchase and distribution of RTI's Plumb-Pex system.

42.     Upon information and belief, Uponor closed the RTI operations in early 2005 and thereafter continued to sell the F1807 Plumb-Pex fittings and system.

43.     Defendants' F1807 fittings are easily identified by a "P-Pex" or "MB Pex" stamp placed on the brass insert fittings and stainless steel clamps ("SSC").

44.     Defendants were negligent in selling these fittings for a number of reasons, including their decision to actively market, promote and sell fittings made from brasses with high zinc content, known as "yellow brass."

45.     Defendants knew or should have known that the brass alloy used for the brass insert fittings they sold and marketed made the fittings susceptible to premature failure through various processes like dezincification and stress corrosion cracking.

46.     Defendants knew or should have known that the fitting design, pex system design, and choice of brass alloy also made the brass insert fittings susceptible to premature failure through stress corrosion cracking and / or dezincification.

47.     Defendants knew or should have known that the manufacturing process used for the brass insert fittings left residual stress and machining imperfections that would cause premature failure through stress corrosion cracking.

48.     The design, materials choices, and manufacturing practices of the brass fittings marketed and sold by Defendants have created a product that is damaged and begins to fail on its first day of use, even if perfectly installed in its intended environment.

49.     Because of their defective design and manufacture, Defendants' F1807 brass insert fittings failed in their intended purpose.

50.     Because of their defective design and manufacture, Defendants' F1807 brass insert fittings are inherently defective and are substantially certain to fail within the express warranty provided with the fittings and / or the useful life of the fittings.

51.     Plaintiff and members of the class own, have installed, or have paid for damages caused by Uponor and RTI plumbing systems with brass insert fittings that have already or are in the process of failing prematurely and thus have suffered or are reasonably certain to suffer actual injury well in advance of the warranted and expected life of their plumbing systems.

**Defendants' Admissions of Defect**

52.     Although they never told consumers, plumbers, or plumbing distributors that they were not the designers and manufacturers of the fittings, Defendants now claim that neither Uponor nor RTI actually designed or manufactured the F1807 brass insert fittings they sold to consumers.  Defendants instead purchased the fittings from foreign companies, including Unique Industrial Product Company ("Unique Industrial").

53.     No later than 2006, Uponor and RTI began receiving reports that their F1807 fittings were failing prematurely when used as intended.

54.     For example, Defendants received reports from NVR, a large national homebuilder, that numerous F1807 fittings had failed prematurely in homes in the State of Virginia.

55.   Uponor and / or RTI agreed to reimburse NVR for the cost of replacing the fittings and / or plumbing systems in more than seven hundred homes.  The cost of those replacements totaled approximately $5 million.

56.   Defendants also received similar reports of prematurely failing F1807 fittings in Minnesota, Wisconsin, Washington, Oregon, Utah, Montana, Missouri, Vermont, Iowa, Michigan, Louisiana, Idaho, Indiana and other of the United States.

57.   As a result of the premature failures of the F1807 fittings, Defendants stopped selling F1807 fittings.  Uponor now only sells insert fittings manufactured to comply with ASTM F1960 or other ASTM standards.

58.   After deciding to stop selling the Plumb-Pex system, Uponor issued a confidential "talking points" memorandum to its employees and sales representatives.  In that memo, Uponor explained the reasons it stopped selling the Plumb-Pex system.  Uponor admitted the product design and quality was one of the reasons: "More importantly, the quality and design of the brass insert fitting used in the [Plumb-Pex system] does not measure up to Uponor's high quality standards."

59.   Knowing that these fittings were defective, Uponor allowed its distributors and contractors to return unused Plumb-Pex components for a complete refund in late 2006.

60.   At some point in 2006, Uponor sought reimbursement from Unique Industrial for the money Uponor paid as a result of premature failures of the F1807 fittings.

61.   In seeking reimbursement from Unique Industrial, Uponor claimed that the F1807 fittings it and RTI had obtained from Unique Industrial, and which Uponor and RTI had sold to the public, were defectively designed or manufactured.

62.     Ultimately, Uponor sued Unique Industrial in federal court in Texas.  In that complaint, Uponor admitted that the F1807 fittings were "defectively manufactured" and "were not merchantable, or suited for their reasonable, expected and intended use in residential plumbing systems, and which were not free from defects in materials, design and workmanship."

63.     Uponor also admitted in the complaint against Unique Industrial that the F1807 fittings were "defective and unreasonably dangerous."

64.     In the course of its lawsuit against Unique Industrial for the premature failures of the F1807 fittings, Uponor retained the services of Cynthia L. Smith, an engineer and one of Uponor's former employees.

65.     Ms. Smith issued reports and opinions in which she concluded that the F1807 fittings bought from Unique Industrial and sold by Defendants were defectively designed and manufactured.  She concluded that the fittings were failing because of stress corrosion cracking that was the result of improper manufacturing practices and off-specification materials.

66.     Ms. Smith also issued reports and opinions in which she concluded that the F1807 fittings bought from Unique Industrial and sold by Defendants had not failed because of installation practices or water conditions.  She so concluded after analyzing fittings that had never been installed – i.e. were still in their original bag -- and yet displayed manufacturing, materials and other defects.

67.     Ms. Smith also issued reports and opinions in which she concluded that the F1807 fittings bought from Unique Industrial and sold by Defendants had failed not because of water conditions and stated: "My conclusion that faulty installation was not a cause of failure in the brass fittings supplied by Unique Industrial was further supported by the history of fittings failures.  A sudden rash of failures occurred in multiple states (where varying water chemistry

conditions existed) during a narrowly defined time period, involving various plumbing contractors who had previous experience successfully installing these components.  This fact also undermines any question of installation error."

68.     In the course of its lawsuit against the Unique Industrial, Uponor also submitted a report and opinion from engineer Thomas Eagar.  Like Ms. Smith, Mr. Eagar also concluded that the fittings sold by RTI and Uponor were defectively manufactured.

69.     Mr. Eagar concluded that the fittings had failed because of improper machining practices, improper alloy composition and microstructure.

70.     Like Ms. Smith, Mr. Eagar also concluded that the composition of many of the fittings failed to comply with the ASTM standards governing F1807 fittings.  Fittings that do not comply with that standard cannot be passed off and sold as being eligible for use in potable water systems in the United States.

71.     Mr. Eagar also concluded that inappropriately elevated finish hardness and other residual stress from manufacture had contributed to the premature failure of the fittings.

72.     In addition to these judicial admissions, Uponor now publicly criticizes the F1807 fitting design.  In a document currently available on its website, Uponor compares its F1960 fittings with the F1807 style fitting both Defendants previously sold.

73.     In that product comparison, Uponor is critical of the thinner wall thickness of the F1807 fittings and states that: "Thinner wall offers less resistance to stress and corrosion."

74.     Uponor therefore itself now publicly criticizes the design flaws in the F1807 fittings and, as it did in its 2006 talking points memorandum, concedes that "the quality and design of the brass insert fitting used in the [Plumb-Pex system] does not measure up to Uponor's high quality standards."

**Replacement of F1807 Fittings and Pex Systems**

75.     Recognizing that the F1807 fittings they sold were defective, Defendants have paid for or authorized the replumbing of certain properties containing those systems.

76.     For example, Defendants have paid for or authorized the replumbing of properties containing systems with F1807 fittings in the State of Virginia.

77.     In addition, Defendants have paid for or authorized the replumbing of properties containing systems with F1807 fittings in the State of Nevada.  In that replumbing program, Defendants agreed to replumb all homes built by D.R. Horton in which Defendants' F1807 fittings are installed.

78.     In an October 2008 letter to homeowners, RTI advised homeowners "of the risk that the plumbing system in your home may be susceptible to future leaks."  In that same letter, RTI offered to pay for complete repiping of plumbing systems owned by the purchasers of D. R. Horton homes.

79.     Unfortunately, Defendants refuse to repipe or replumb the homes or properties of all persons or entities who own systems with Defendants' F1807 fittings.  Defendants instead apparently offer that work to only the customers of large home builders, leaving other consumers without the benefit of the same replacement.

80.     Defendants have refused the requests to of property owners to replumb their home to replace the fittings Defendants themselves have admitted are defective, unreasonably dangerous and not merchantable.

**Inadequate Testing of Brass Insert Fittings**

81.     Contrary to statements made in their advertising and marketing, Defendants did not test and did not ensure that the F1807 brass insert fittings had been tested in their anticipated

environments before selling those fittings to the public. Defendants also failed to require their suppliers to perform such testing.

82.     Defendants did not "end use" test the brass insert fittings in pex plumbing systems and instead they or their suppliers used various assumptions when choosing or specifying the design and materials for this system. Such a practice violates engineering and manufacturing standards and accepted practice. Defendants also failed to require their suppliers to perform such testing.

83.     Defendants and / or their suppliers also conducted inadequate testing on their F1807 brass insert fittings and failed to test things that they knew or should have known would lead to premature failure of the brass fittings. Defendants also failed to require their suppliers to perform such testing.

84.     Defendants and / or their suppliers also failed to investigate or test whether well-known and expected water conditions would lead to premature failure of the brass insert fittings. Defendants also failed to require their suppliers to perform such testing.

**False Advertising of Pex Plumbing Systems**

85.     Defendants falsely advertised that their pex plumbing systems – including their F1807 brass insert fitting components -- were reliable despite never testing and determining the reliability of the product when used in real world conditions.

86.     Defendants also falsely advertised that RTI had a long history in the plumbing industry and falsely claimed that the Plumb-Pex system was proven, reliable and the result of rigorous engineering and quality control.

87.     For example, on RTI's web site, www.radiant-tech.com, Defendants advertised Radiant Technology in 1997 as company only in the business of selling radiant heating systems.

Yet the very next year in 1998, RTI began claiming on the same web site that "Radiant Technology is a North American leader in the manufacture of both plumbing and heating products."  Defendants knew that this statement was false and misleading because, among other things, RTI had just started selling plumbing systems for potable water.  In addition, Defendants knew that they were not in fact manufacturing plumbing systems and knew that they were not the manufacturer of the Plumb-Pex brass fittings.  Defendants continued to make these false statements on the www.radiant-tech.com web site until the fall of 2002.  They then continued to make the same or similar false statements on RTI's new web site, www.rti-systems.com, until the fall of 2004 when they announced that RTI would be closed.

88.     On RTI's web site, www.radiant-tech.com, Defendants falsely claimed in 1998 that "Plumb-Pex is proven, reliable and completely safe for you and your family."  Defendants knew that this statement was false and misleading because, among other things, RTI apparently did not do any engineering of the Plumb-Pex system and instead simply bought the fittings from manufacturers located in Asia.  Defendants now claim that they did not design or manufacture the Plumb-Pex fittings and had absolutely no idea whether this system was "reliable" as they advertised to the public.  In addition, this statement falsely claims that the Plumb-Pex system, which had just been developed and had little or no track record in the field, was "proven" or "reliable."  Defendants continued to make these false statements on the www.radiant-tech.com web site until at least the fall of 2002.  They then continued to make the same or similar false statements on RTI's new web site, www.rti-systems.com, until the fall of 2004 when they announced that RTI would be closed.

89.     On RTI's web site, www.radiant-tech.com, Defendants falsely claimed in 1998 that "Our Plumb-Pex system is a carefully engineered flexible piping system that provides a

durable, proven, and guaranteed solution to all your plumbing needs.  RTI maintains the highest

quality standards in the industry."  Defendants knew that this statement was false and misleading

because, among other things, RTI apparently did not do any engineering of the Plumb-Pex

system and instead simply bought the fittings from manufacturers located in Asia.  Defendants

now claim that they did not design or manufacture the Plumb-Pex fittings and had absolutely no

idea whether this system was "carefully engineered" as they advertised to the public.  In

addition, this statement falsely claims that the Plumb-Pex system, which had just been developed

and had little or no track record in the field, was "proven" or "durable."  In addition, RTI knew it

did not have "the highest quality standards in the industry" when it did no quality control on the

fittings in question.  Defendants continued to make these false statements on the www.radiant-

tech.com web site until at least the fall of 2002.  They then continued to make the same or

similar false statements on RTI's new web site, www.rti-systems.com, until the fall of 2004

when they announced that RTI would be closed.

      90.     On 1998 RTI's web site, www.radiant-tech.com, Defendants falsely claimed that

"With Radiant Technology's dedication to quality, you're assured of a long lasting and trouble

free plumbing system."  Defendants continued to make these false statements on the

www.radiant-tech.com web site until at least the fall of 2002.  They then continued to make the

same or similar false statement on RTI's new web site, www.rti-systems.com, until the fall of

2004 when they announced that RTI would be closed.  Defendants knew that this statement was

false and misleading because, among other things, RTI did not do any quality control of the

manufacturing process of the Plumb-Pex fittings and instead simply bought the fittings from

third party manufacturers in Asia.  Defendants therefore had no basis to represent that the quality

standards used for the manufacture of the Plumb-Pex fittings would assure a long lasting and

trouble free plumbing system.  Defendants have since admitted in their lawsuit against Unique

Industrial that Unique Industrial did not use acceptable quality standards and instead used

substandard and unacceptable quality control and manufacturing processes.

91.     In November 2002, Defendants published a Plumb-Pex brochure they distributed

to consumers and made available on the RTI web site, www.rtisystems.com.  In that brochure,

Defendants falsely claimed that the Plumb-Pex system was a "carefully engineered flexible

piping system which provides a durable, proven, and guaranteed solution to all your plumbing

needs."  Defendants continued to distribute the same or similar statements in that brochure for at

least several years.  Defendants knew that this statement was false and misleading because,

among other things, RTI apparently did not do any engineering of the Plumb-Pex system and

instead simply bought the fittings from manufacturers in Asia.  Defendants have since admitted

that they did not design or manufacture the fittings used in this system and have absolutely no

idea whether this system was "carefully engineered" as they advertised to the public.  In

addition, this statement falsely claims that the Plumb-Pex system, which had only been sold for a

few years, was "durable" and "proven."

92.     In November 2002, Defendants published a Plumb-Pex brochure they distributed

to consumers and made available on the RTI web site, www.rtisystems.com.  In that brochure,

Defendants falsely claimed that "We have the highest quality standards in the industry."

Defendants continued to distribute the same or similar statements in that brochure for at least

several years.  Defendants knew that this statement was false and misleading because, among

other things, RTI did not do any quality control of the manufacturing process of the Plumb-Pex

fittings and instead simply brought the fittings from third party suppliers in Asia.  Defendants

therefore had no basis to represent that the quality standards used for the manufacture of the

Plumb-Pex fittings were "the highest quality standards in the industry." Defendants have since admitted in their lawsuit against Unique Industrial that Unique Industrial did not use the highest quality standards in the industry and instead used substandard and unacceptable quality control and manufacturing processes.

93.     In November 2002, Defendants published a Plumb-Pex brochure they distributed to consumers and made available on the RTI web site, www.rtisystems.com. In that brochure, Defendants falsely claimed that "With RTI's dedication to quality, you're assured of a long lasting and trouble free plumbing system." Defendants continued to distribute the same or similar statements in that brochure for at least several years. Defendants knew that this statement was false and misleading because, among other things, RTI did not do any quality control of the manufacturing process of the Plumb-Pex fittings and instead simply bought the fittings manufacturers in Asia. Defendants therefore had no basis to represent that the quality standards used for the manufacture of the Plumb-Pex fittings would assure a long lasting and trouble free plumbing system. Defendants have since admitted in their lawsuit against Unique Industrial that Unique Industrial did not use acceptable quality standards and instead used substandard and unacceptable quality control and manufacturing processes.

94.     Beginning no later than 2003, the "Who we are" section of the RTI web site, www.rtisystems.com falsely claimed that "Our Radiant Technology Heating and Plumb-Pex Plumbing Systems are a result of over 20 years of experience and are backed by RTI's steadfast commitment to quality, product innovation, engineering and manufacturing technology." Defendants continued to make this statement on that site for at least several years. Defendants knew that this statement was false and misleading because, among other things, the Plumb-Pex system was new and had not been in existence for 20 years. Nor did RTI have 20 years' of

experience in the plumbing industry.  Defendants also knew that this statement was false and misleading because RTI did not do any quality control of the manufacturing process of the Plumb-Pex fittings and instead simply bought the fittings from manufacturers in Asia. Defendants therefore had no basis to represent that the quality and engineering standards used for the manufacture of the Plumb-Pex fittings were acceptable or of high quality.  Defendants have since admitted in their lawsuit against Unique Industrial that Unique Industrial did not use acceptable quality standards and instead used substandard and unacceptable quality control and manufacturing processes.

95.     Beginning no later than 2003, the "Who we are" section of the RTI web site, www.rtisystems.com falsely claimed that "All RTI products undergo thorough testing to pass not only our strict quality standards, but to assure that we exceed those set by independent quality assurance agencies both in America and abroad."  Defendants continued to make this statement on that site for at least several years.  Defendants knew that this statement was false and misleading because, among other things, because RTI did not do any quality control of the manufacturing process of the Plumb-Pex fittings and instead simply bought the fittings through manufacturers in Asia.  Defendants therefore had no basis to represent that fittings had undergone thorough testing to pass RTI's "strict quality standards."  Defendants knew that they did nothing to test the quality of the fittings and had no idea whether any testing or quality assurance was being done by the suppliers of the fittings.

96.     Each of the false statements and misrepresentations made in the preceding paragraphs were repeatedly restated by Defendants' sales personnel, including but not limited to Frank Bilotta and David Holdorf, as well as Defendants' manufacturer's representatives, in the course of virtually every sale of the brass fittings at issue here.  All of the sales and product

literature provided by Defendants falsely implied that the Plumb-Pex system was proven, reliable, time tested, and the result of rigorous engineering and quality control practices. Defendants, however, knew at the time these statements were provided to consumers, suppliers, and contractors that the statements were false and unsupported.

97.     At all times and in all communications with consumers, suppliers and contractors, Defendants and their representatives knowingly misrepresented RTI's experience in the plumbing industry.  Contrary to the statements referenced herein, RTI was new to the potable water plumbing industry and had no experience in the design, manufacture and quality control of potable water plumbing systems and the brass fittings used for those systems.

98.     At all times and in all communications with consumers, suppliers and contractors, Defendants and their representatives knowingly misled consumers into believing that RTI and/or Uponor actually designed, manufactured and quality controlled the Plumb-Pex system.  In reality, Defendants knew that they had delegated all of those tasks to foreign manufacturers without any oversight by Defendants about the materials selections and manufacturing practices used to make the brass insert fittings used in those systems.

99.     The falsity of Defendants' representations set out above can be seen from Defendants' judicial admissions.  For example, Uponor states in its Amended Complaint in its lawsuit against Unique Industrial that: "Unique Industrial selected Duksan Metal Co. of Korea to design, engineer and manufacture the Fittings.  Neither RTI nor Uponor participated in the selection of Duksan nor did they have contact with Duksan relating to the means, methods or circumstances regarding the manufacture of the fittings."

100.     In addition, Uponor states in its Amended Complaint in its lawsuit against Unique Industrial that Unique Industrial:

a) defectively manufactured the subject Fittings;

b) failed to take reasonable steps to ensure that the Fittings would not be subject or prone to fracturing post-manufacture in expected and intended residential use;

\* \* \*

d) failed to properly test, inspect and evaluate the Fittings . . . prior to distributing those products to determine that they were suitable and fit for installation in residential plumbing systems;

e) supplied RTI and UPONOR with . . . Fittings that were not merchantable, or suited for their reasonable, expected and intended use in residential plumbing systems, and which were not free from defects in materials, design and workmanship;

\* \* \*

g) failed to supply Fittings that complied with ASTM standard F1807 and the chemical composition requirements specified in the attachments thereto;

These admissions about the engineering, quality control, and compliance with ASTM standards starkly contrast the false statements made by Defendants to sell the Plumb-Pex systems.

101.    At all times and in all communications with consumers, suppliers and contractors, Defendants and their representatives knowingly misled consumers into believing that the Plumb-Pex system was designed, manufactured and quality controlled in the United States.  In reality, Defendants knew that they had sourced all of those tasks to foreign manufacturers without any oversight by Defendants about the materials selections and manufacturing practices used to make the brass insert fittings used in those systems.

102.    At all times and in all communications with consumers, suppliers and contractors, Defendants and their representatives knowingly misled consumers into believing that the Plumb-Pex system was designed, manufactured and quality controlled in the United States by virtue of Defendants' placement of a stamp on those fittings that read "US-PW." Defendants knew and intended that such a stamp would mislead U.S. consumers into believing that the fittings were manufactured in the United States for use in potable water ("PW") systems.

Defendants did this to conceal the fact that they did not in fact manufacture the fittings and that they had instead purchased the fittings cheaply from Asia and instructed that the manufacturers in Korea and Taiwan affix these stamps to the fittings.

103.     At all times and in all communications with consumers, suppliers and contractors, Defendants and their representatives knowingly misled consumers into believing that the Plumb-Pex system was designed, manufactured and quality controlled in the United States by virtue of Defendants' placement of a stamp on those fittings that read "P-Pex," to indicate Defendants' trademarked Plumb-Pex brand.  Defendants knew and intended that such a stamp would mislead U.S. consumers into believing that the fittings were manufactured by them in the United States for use in potable water systems.  Defendants did this to conceal the fact that they did not in fact manufacture the fittings and that they had instead purchased the fittings cheaply from Asia and instructed that the manufacturers in Korea and Taiwan affix these stamps to the fittings.

104.     Whether the fittings were manufactured in the United States was a material fact for the consumers and purchasers of Plumb-Pex systems.  Defendants both intentionally and by omission concealed the country of origin of the fittings with the intent that consumers and purchasers rely on those representations and omissions.

105.     Plaintiff and their representatives believed, based on Defendants' representations, that Defendants designed, manufactured and quality controlled the Plumb-Pex fittings.  Plaintiff and their representatives would not have purchased or used Plumb-Pex fittings if they had known the truth about who designed, manufactured and quality controlled the fittings.

106.     When Defendants and their representatives made each of the affirmative misrepresentations outlined above, Defendants knew the representations were false and /or

misleading.  Defendants and their representatives intended that consumers and purchasers of the Plumb-Pex system would rely on the false and misleading statements.  Mr. Perrone's builder, who purchased and installed Defendants' pex plumbing systems in numerous houses, in fact relied on such representations in its decision to purchase and use Defendants' systems.

107.     Defendants also falsely stated in their advertising brochures and web site listings that the brass insert fittings used in the Plumb-Pex systems complied with ASTM F1807.  For example, the April 2003 Plumb-Pex Plumbing Systems Design and Installation brochure states that "Plumb-Pex fittings are manufactured of solid brass to ASTM F-1807 '*Metal Insert Fittings'* specifications.  Other literature produced by Defendants makes similar representations and similar representations were repeatedly made throughout the years on Defendants' www.radiant-tech.com and www.rti-systems.com web sites.

108.     In addition to the representations made in their advertising materials and on their web sites, every one of the brass insert fittings sold by Defendants had a stamp on the side of the fitting which indicated that the fittings conformed to ASTM F877 and ASTM F1807.  When a product or packaging is marked with the ASTM designation F1807, the product is represented to have been manufactured, tested, inspected and sampled in accordance with F1807 and has been found to meet F1807 requirements.

109.     Defendants' fittings, however, did not comply with various aspects of the F1807 requirements including alloy composition and dimensions.  Defendants knew or should have known that their advertising statements about compliance with ASTM standards were false. Defendants knew or should have known that their certification of compliance with ASTM standards by stamping those designations on the fittings were false.

110.     At all times and in all communications with consumers, suppliers and contractors, Defendants and their representatives knowingly misled consumers into believing that the brass insert fittings in their Plumb-Pex system complied with ASTM standards. Plaintiff, their representatives and other consumers relied on these misrepresentations because the Plumb-Pex fittings could not have been used in potable water systems in the United States without compliance with those standards.  Defendants, therefore, passed off brass fittings as being of a particular quality, standard or grade that they were in fact not.

111.     Contrary to their representations about the fittings having been manufactured, tested, inspected and sampled in accordance with F1807, Uponor's experts Ms. Smith and Mr. Eagar have concluded that the Plumb-Pex fittings failed to meet F1807 requirements.

112.     Defendants also falsely represented that owners of their pex plumbing systems "can rest assured that your new plumbing . . . system will provide a lifetime of reliable service."

113.     Defendants also falsely advertised and represented that their pex plumbing systems and their F1807 brass insert fittings had been subject to decades of "rigorous testing . . . and testing and testing and testing."

114.     Defendants also falsely marketed their pex plumbing systems as being safe, reliable, and corrosion-resistant.

115.     Defendants also falsely marketed and warranted their pex plumbing systems as being extensively tested, and that based on the results of those tests, the pex plumbing system and their F1807 brass insert fittings were properly designed, developed, marketed, and manufactured so as to perform adequately, reliably and as represented.

116.     Defendants also falsely marketed and warranted that their pex plumbing systems were superior to copper plumbing systems.

117.    Defendants also falsely marketed and warranted that their pex plumbing systems and the F1807 brass insert fittings were of superior design and materials than similar products made by competitors.

118.    When Defendants and their representatives made each of the affirmative misrepresentations outlined above, Defendants knew the representations were false and / or misleading.  Defendants and their representatives intended that consumers and purchasers of the Plumb-Pex system would rely on the false and misleading statements.

119.    Defendants and their authorized agents and distributors made each of the above described assertions, statements, representations and warranties with the intent and purpose of inducing plumbing suppliers, builders, plumbers, and consumers to purchase and install pex plumbing systems and their F1807 brass insert fittings in their properties throughout the country.

**Defendants' Omissions About the Quality of Their Plumb-Pex Fittings**

120.    Defendants also made numerous material omissions and uniformly withheld important information relating to the design, reliability and performance of their brass insert fittings and pex plumbing systems.

121.    Among these omissions were the failure to inform purchasers and consumers about the tendency for these fittings to fail because of stress corrosion cracking or dezincification and to inform them that Defendants and their suppliers had done little or no testing to determine whether these fittings and the systems in which they were used would perform well in real world conditions.

122.    Defendants also omitted material information about the limitations of the high zinc content yellow brass fittings including, for example, that the published literature going back as far as the 1940's had shown the propensity of that type of brass to crack even in pure water.

123.     Defendants also omitted material information about the limitations of the high zinc content yellow brass fittings including, for example, that the propensity of that type of brass to crack exponentially increases following rough machining or finish practices like those used by Defendants and / or their suppliers.

124.     Defendants also omitted material information from consumers about their lack of quality control or input about the design and manufacturing practices used to make the Plumb-Pex fittings.

125.     Defendants also omitted material information from consumers including the fact that Defendants had completely delegated the design, manufacture and quality control of the Plumb-Pex fittings to foreign manufacturers located in Asia or elsewhere.

126.     Defendants also omitted material information about their belief that "the quality and design of the brass insert fitting used in the [Plumb-Pex system] does not measure up to Uponor's high quality standards."

127.     Defendants also omitted material information from consumers about the country of origin and origin of the design and manufacture of the Plumb-Pex fittings.

128.      Defendants also omitted material information from consumers about the availability of materials that were more resistant to stress corrosion cracking than the high zinc content yellow brass used to make the Plumb-Pex fittings.

129.     Defendants also omitted material information from consumers about RTI's lack of experience in the plumbing industry and the fact that it had never manufactured or sold pex plumbing products before it began selling the Plumb-Pex system.

130.     Each of the omissions made in the preceding paragraphs were repeatedly made by Defendants' sales personnel, including but not limited to Frank Bilotta and David Holdorf, as

well as Defendants' manufacturer's representatives, in the course of virtually every sale of the brass fittings at issue here.  All of the sales and product literature provided by Defendants, Defendants' web sites, and their sales presentations all omitted the material facts recited herein. Defendants never disclosed the true facts they omitted as described above.

131.    Had Defendants not withheld and omitted this material information about the design, reliability and performance of their F1807 brass insert fittings and pex plumbing systems, Plaintiff, his representatives and the members of the putative class would not have purchased those products or allowed them to be installed in their homes or properties.

**Field Failures of Defendants' Pex Plumbing systems**

132.    By 2006 at the latest, Defendants received notice that their brass insert fittings were failing prematurely.

133.    Defendants' brass insert fittings have failed prematurely in numerous locations throughout the United States, including North Carolina, Arizona, Florida, Minnesota, Virginia, Washington, Wisconsin, Oregon, Utah, Montana, Missouri, Vermont, Iowa, Michigan, Louisiana, Idaho, and Indiana.

134.    Defendants analyzed the cause of these failures and concluded that the fittings were failing because of stress corrosion cracking and / or dezincification.

135.    To date, Defendants have received hundreds of warranty claims for the failed F1807 style fittings.

136.    Because of these failures, Defendants have completely stopped selling F1807 style fittings.

137.    In recognition of the problems with its choice of high zinc content brass, Uponor now offers different materials for use in its pex plumbing fittings.

**Plaintiff Charles Perrone's Circumstances**

138.    After receiving and relying on the misrepresentations and omissions described herein, Mr. Perrone's builder, Palm Harbor, purchased Defendants' pex plumbing systems through Defendants' authorized distributors.  Through his builder, Palm Harbor, Mr. Perrone purchased and had a pex plumbing system installed in his home located in Jamesville, North Carolina.  That pex plumbing system used the brass fittings marketed and sold by Defendants and described herein.

139.    After receiving and relying upon the misrepresentations and omissions described herein, Mr. Perrone's builder, Palm Harbor recommended, purchased and installed Defendants' pex plumbing systems in the homes or businesses of its customers.

140.    After purchase, one of the F1807 fittings sold by Defendants failed at the Perrone home causing substantial damage to his property other than the pex plumbing system.

141.    Plaintiff Perrone filed an insurance claim to help pay for repairing the damage to his air conditioner, sheetrock, flooring, and carpeting and paid a $250 deductible.  The home however, requires additional repairs to correct damage caused by his failed pex plumbing system.

142.    Plaintiff, like many class members, has already suffered out-of-pocket damage to repair his home following the premature failures of Defendants' brass insert fittings.  Likewise, all putative class members have incurred or are reasonably certain to incur, the cost of repairing their homes because of fittings failures and / or prematurely replacing their plumbing systems.

143.    Plaintiff and the proposed class members suffered general and specific compensatory and contractual damages including, without limitation consequential, incidental, loss of use, diminution of value, attorneys' fees, costs and disbursements.

## CLASS ALLEGATIONS

144.    Plaintiff brings this class action on behalf of themselves and all others similarly situated, for all claims alleged herein, pursuant to Rule 23 of the Federal Rules of Civil Procedure.  The first proposed class is defined as:

> All persons and entities that own a structure that contains a pex plumbing system with F1807 brass insert fittings sold by Uponor or RTI. The proposed class includes, without limitation, all such persons or entities who contacted Defendants or their representatives about their pex plumbing system and were denied or partially denied warranty coverage and /or replacement of their pex plumbing system.

145.    Alternatively, Plaintiff brings this class action on behalf of himself and all others similarly situated, for all claims alleged herein, pursuant to Rule 23 of the Federal Rules of Civil Procedure,  for a second proposed class defined as:

> All persons and entities that own a structure, within certain of the United States, which contains a pex plumbing system with F1807 brass insert fittings sold by Uponor or RTI. The proposed class includes, without limitation, all such persons or entities who contacted Defendants or their representatives about their pex plumbing system and were denied or partially denied warranty coverage and /or replacement of their pex plumbing system.

146.    Plaintiff specifically excludes Defendants or their related entities from the putative class, all subsidiaries or affiliates of Uponor; any entity in which Defendants have a controlling interest; and any and all of Defendants' employees, affiliates, legal representatives, heirs, successors or assignees.

147.    Plaintiff also specifically excludes from the putative class any person or entity that has previously commenced and concluded a lawsuit against Defendants arising out of the subject matter of this lawsuit.

148.    Plaintiff also specifically excludes from the putative class the judge assigned to this case and any member of the judge's immediate family.

149.    Plaintiff specifically includes in the putative class the claims of all persons or entities, like insurance companies, that have paid for the repair, replacement and / or damage caused by prematurely failed brass insert fittings sold by Defendants.

150.    This class action satisfies numerosity, commonality, typicality, adequacy and superiority requirements for maintaining a class.

151.    **Numerosity.**  Pursuant to Rule 23(a)(1) of the Federal Rules of Civil Procedure, the putative class "is so numerous that joinder of all members is impracticable."  The number of members of the putative class is believed to be tens of thousands of individuals and/or entities that own properties with Defendants' pex plumbing systems with F1807 brass insert fittings.

152.    Joinder of the persons and entities into whose properties the Defendants' pex plumbing systems were installed is impractical and not feasible.

153.    **Commonality.**  Pursuant to Rule 23(a)(2) of the Federal Rules of Civil Procedure, the putative class shares "questions of law or fact" that predominate and individualized issues.  The common questions include, but are not limited to, the following:

- Were Defendants' brass insert fittings defectively designed for their intended application?

- If so, what is the nature of the design defect?

- Were Defendants' brass insert fittings defectively manufactured?

- Did Defendants fail to warn consumers that the brass insert fittings were not properly tested during design and development process?

- Did Defendants adequately warn consumers about any types of installations that may cause premature failure of the brass insert fittings?

- Did Defendants make fraudulent, false, deceptive and/or misleading statements in connection with the sale of pex plumbing systems in their product literature, including those relating to standards and reliability?

- Did Defendants omit material information when they sold their pex plumbing systems and F1807 brass insert fittings?

- Did Defendants properly account for foreseeable variations in installation in the development and design of their pex plumbing system and brass insert fittings?

- Did Defendants exercise reasonable care in the design, manufacture and testing of their pex plumbing system and F1807 brass insert fittings?

- Are the brass insert fittings progressively deteriorating at an accelerated rate?

- Will the brass insert fittings fail prematurely?

- Did Defendants deliberately sell or allow brass insert fittings to be distributed after they knew the fittings were failing at an increased rate?

- What categories of damages are recoverable for owners of structures with Defendants' pex plumbing systems and brass insert fittings, e.g., replacement, consequential, incidental or other damages?

- Is Plaintiff entitled to relief under Defendants' express warranties?

- Can the class obtain a declaration concerning the types and categories of damages and remedies available to putative class members?

- Should Defendants be enjoined from denying warranty claims based on alleged warranty disclaimers or limitations?

- Are Plaintiff's claims barred in whole or in part by any of Defendants' affirmative defenses?

154.    **Typicality.**  Pursuant to Rule 23(a)(3) of the Federal Rules of Civil Procedure, the claims of the putative class representative, Plaintiff Perrone, "are typical of the claims … of the class."  Plaintiff and all members of the putative class who own Defendants' defective pex plumbing systems with F1807 brass insert fittings have suffered damages as a result of Defendants' wrongful acts and misconduct.  Pursuant to corporate directives, Defendants engaged in a similar pattern of misconduct towards both the Plaintiff and all the other putative class members.

155.    **Adequacy**.  Pursuant to Rule 23(a)(4) of the Federal Rules of Civil Procedure, the putative class representative "will fairly and adequately protect the interests of the class."  Plaintiff has no adverse interests to the putative class members.  Plaintiff was sold a plumbing

system with defective brass insert fittings.  Plaintiff has retained lawyers who have substantial resources, experience and success in the prosecution and defense of class action, mass tort and complex litigation, and the insurance coverage and settlement issues attendant to the same.

156.    **Superiority.**  Pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, a class action is a superior method of resolving this action for the following reasons:  A class action in this instance conserves the resources of the putative class, Defendants and the Court. The damages of most putative class members are not, in isolation, significant enough to hire an attorney on a contingency basis, and the burden and expense of hiring an attorney on a per diem basis for Plaintiff and most putative class members, makes it difficult if not impossible for the class members to seek redress.  On information and belief, no Attorney General of any state has brought an enforcement action against Defendants to remedy the claims asserted herein. Because the nature of the claims involved, the class members need swift and uniform resolution of their claims before additional damage is caused by plumbing system failures.

Further, there may or will be other cases pending against Defendants.  Serial adjudications in numerous venues are not efficient, timely, or proper.  Judicial resources throughout the United States will be unnecessarily depleted by resolution of individual claims. Joinder on an individual basis of thousands of claimants in any one suit would be impractical or impossible.  Individualized judgments and rulings could result in inconsistent relief for similarly situated Plaintiff.  Individualized lawsuits could also establish incompatible standards of conduct for Defendants in creating, marketing, sale and post-sale conduct in connection with their pex plumbing systems and brass insert fittings.

## COUNT I

### (CONSUMER FRAUD)

157.    Plaintiff and the proposed Class reallege the foregoing paragraphs, inclusive, as though fully set forth herein.

158.    Minnesota Statutes § 325F.69, subd. 1 makes it unlawful for any person by use of "any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby…."

159.    By engaging in the conduct described herein, Defendants violated and continue to violate Minn. Stat. § 325F.69, subd. 1.

160.    By making the misrepresentations set out herein, which are hereby incorporated, Defendants used false pretenses, false promises, misrepresentations, and misleading statements, all with the intent that others rely on those statements, in the course of the sale of their F1807 fittings.

161.    By making the omissions set out herein, which are hereby incorporated, Defendants used false pretenses, false promises, misrepresentations, and misleading statements, all with the intent that others rely on those statements, in the course of the sale of their F1807 fittings.

162.    Defendants' wrongful conduct and use of false pretenses, false promises, misrepresentations, and misleading statements, all with the intent that others relied on those statements, also includes, by way of example and not by limitation:

  a.    Defendants' fraudulent, misleading, and deceptive statements and practices relating to their pex plumbing system and F1807 brass insert fittings;

  b.    Defendants' fraud and misrepresentation by omission, of information about the defective nature of their pex plumbing system and brass insert fittings, the improper design of the products, and Defendants' knowledge of those defects,

      c.      Defendants' concealment of the true nature of their defective plumbing system, and

      d.      Defendants' continued sale of F1807 fittings after they knew about problems with their design and manufacture.

163.    Plaintiff Charles Perrone's builder relied upon the misrepresentations and omissions made by Defendants and described herein when deciding to purchase and install a Plumb-Pex system in Mr. Perrone's home.

164.    As a result of Defendants' fraud, false pretense, false promises, misrepresentations, misleading statements and deceptive practice practices relating to the sale of their pex plumbing systems and brass insert fittings, the Plaintiff and putative class have suffered actual damages in that they have purchased and installed in homes and structures a plumbing system that is defective and that is damaged from its first use.

165.    As a result of Defendants' fraud, false pretense, false promises, misrepresentations, misleading statements and deceptive practices, the Plaintiff and putative class will suffer damages that include not only the full cost to replace their brass insert fittings, but also include, without limitation, consequential and incidental damages.

166.    That as a direct, proximate and foreseeable result of Defendants' violation of statute, the Plaintiff and putative class members sustained damages, in the aggregate, in excess of $75,000.00.

## COUNT II

### (UNLAWFUL TRADE PRACTICES)

167.    Plaintiff and the proposed Class reallege the foregoing paragraphs, inclusive, as though fully set forth herein.

168.    Minnesota Statutes § 325D.13 provides that, "No person shall, in connection with the sale of merchandise, knowingly misrepresent, directly or indirectly, the true quality, ingredients or origin of such merchandise."

169.    By engaging in the conduct described herein, Defendants violated and continue to violate Minn. Stat. § 325D.13.

170.    By making the misrepresentations set forth herein, which are hereby incorporated, Defendants knowingly misrepresented the true quality and origin of their Plumb-Pex system with the intent that others would rely on those statements.

171.    By making the omissions set forth herein, which are hereby incorporated, Defendants knowingly misrepresented the true quality and origin of their Plumb-Pex system with the intent that others would rely on those statements.

172.    Defendants' wrongful conduct and misrepresentation of the true quality and origin of their pex plumbing systems and brass insert fittings, also includes, by way of example and not by limitation:

   a.    Defendants' fraudulent, misleading, and deceptive statements and practices relating to their pex plumbing system and F1807 brass insert fittings;

   b.    Defendants' fraud and misrepresentation by omission, of information about the defective nature of their pex plumbing system and brass insert fittings, the improper design of the products, and Defendants' knowledge of those defects,

   c.    Defendants' concealment of the true nature of their defective plumbing system, and

   d.    Defendants' continued sale of F1807 fittings after they knew about problems with their design and manufacture.

173.    Defendants and their agents and distributors also misrepresented the true quality and origin of Defendants' pex plumbing system and their brass insert fittings by making the

various statements about the alleged quality of the systems and brass insert fittings referenced throughout this Complaint.

174.     Plaintiff Charles Perrone's builder relied upon the misrepresentations and omissions made by Defendants and described herein when deciding to purchase and install a Plumb-Pex system in Mr. Perrone's home.

175.     As a result of Defendants' practices relating to misrepresentation of the true quality of their pex plumbing systems and their brass insert fittings, the Plaintiff and putative class have suffered actual damages in that they have purchased and installed in homes and structures a plumbing system that is defective and that is damaged the first time it is used.

176.     As a result of Defendants' practices relating to misrepresentation of the true quality of their pex plumbing systems and their brass insert fittings, Plaintiff and the putative Class will suffer damages that include not only the full cost to replace their brass insert fittings and plumbing systems, but also include, without limitation, consequential and incidental damages.

177.     That as a direct, proximate and foreseeable result of Defendants' violation of statute, Plaintiff and the putative Class sustained damages, in the aggregate, in excess of $75,000.00.

## COUNT III

### (DECEPTIVE TRADE PRACTICES)

178.     Plaintiff and the proposed Class reallege the foregoing paragraphs, inclusive, as though fully set forth herein.

179.     Minnesota Statutes § 325D.44, subd. 1 provides in part:

> A person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person:

(5)     Represents that goods or services
have…characteristics, ingredients, uses,
benefits…that they do not have…

(7)     Represents that goods or services are of a
particular standard, quality, or grade,…if they are
of another.

(13)   Engages in any other conduct which
similarly creates a likelihood of confusion or of
misunderstanding.

180.    By engaging in the conduct described herein, Defendants violated and continue

to violate Minn. Stat. § 325D.44.

181.    By making the misrepresentations set forth herein, which are hereby

incorporated, Defendants knowingly misrepresented the true characteristics, standards, quality,

and grade of their pex plumbing systems and brass insert fittings with the intent that others

would rely on those statements.

182.    By making the omissions set forth herein, which are hereby incorporated,

Defendants knowingly misrepresented the true characteristics, standards, quality, and grade of

their pex plumbing systems and brass insert fittings with the intent that others would rely on

those statements.

183.    Defendants' wrongful conduct and misrepresentation of the true characteristics,

standards, quality, and grade of their pex plumbing systems and brass insert fittings, also

includes, by way of example and not by limitation:

a.      Defendants' fraudulent, misleading, and deceptive statements relating to the true
        characteristics, standards, quality, and grade of their pex plumbing system and
        their brass insert fittings;

b.      Defendants' fraud and misrepresentation by omission, of information about the
        defective nature of Defendants' pex plumbing systems and their brass insert

fittings, the improper design of the products, and Defendants' knowledge of those defects, and

c.      Defendants' concealment of the true nature of their defective plumbing systems

184.    Defendants and their agents and distributors also misrepresented the true characteristics, standards, quality, and grade of their pex plumbing systems and their brass insert fittings by making the various statements about the alleged quality of the systems and brass insert fittings referenced throughout this Complaint.

185.    Plaintiff Charles Perrone's builder relied upon the misrepresentations and omissions made by Defendants and described herein when deciding to purchase and install a Plumb-Pex system in Mr. Perrone's home.

186.    As a result of Defendants' practices relating to misrepresentation of the true characteristics, standards, quality, and grade of their pex plumbing systems and its brass insert fittings, Plaintiff and the putative Class have suffered actual damages in that they have purchased and installed in homes and structures a plumbing system that is defective and that is damaged the first time it is used.

187.    As a result of Defendants' practices relating to misrepresentation of the true characteristics, standards, quality, and grade of their pex plumbing systems and brass insert fittings, Plaintiff and the putative class will suffer damages that include not only the full cost to replace their brass insert fittings and plumbing systems, but also include, without limitation, consequential and incidental damages.

188.    That as a direct, proximate and foreseeable result of Defendants' violation of statute, Plaintiff and the putative class members sustained damages, in the aggregate, in excess of $75,000.00.

## COUNT IV

## (FALSE ADVERTISING)

189.    Plaintiff and the proposed Class reallege the foregoing paragraphs, inclusive, as though fully set forth herein.

190.    That Minnesota Statutes § 325F.67 provides in part:

> Any person, firm, corporation, or association who, with intent to sell or in any way dispose of merchandise, …service, directly or indirectly, to the public, for sale or distribution, or with intent to increase the consumption thereof, or to induce the public in any manner to enter into any obligation relating thereto, makes, publishes, disseminates, circulates, or places before the public, or causes, directly or indirectly, to be made, published, disseminated, circulated, or places before the public, in this state, in a newspaper or other publication, or in the form of a book, notice, handbill, poster, bill, label, price tag, circular, pamphlet, program, or letter, or over any radio or television station, or in any other way, an advertisement of any sort regarding merchandise,…service or anything so offered to the public for use, consumption, purchase, or sale, which advertising contains any material assertion, representation or statement of fact which is untrue, deceptive, or misleading, shall, whether or not pecuniary or other specific damage to any other person occurs as a direct result thereof, be guilty of a misdemeanor, and any such act is declared to be a public nuisance and may be enjoined as such.

191.    That by engaging in the conduct described herein, Defendants violated and continue to violate Minn. Stat. § 325F.67.

192.    By making the misrepresentations set forth herein, which are hereby incorporated, Defendants made untrue, deceptive, and misleading assertions and representations about their pex plumbing systems and brass insert fittings with the intent that others would rely on those statements.

193.    By making the omissions set forth herein, which are hereby incorporated, Defendants knowingly made untrue, deceptive, and misleading assertions and representations

about their pex plumbing systems and brass insert fittings with the intent that others would rely on those statements.

194.    Defendants' untrue, deceptive, and misleading assertions and representations about their pex plumbing systems and brass insert fittings, also include, by way of example and not by limitation:

    a.    Defendants' fraudulent, misleading, and deceptive statements relating to the true characteristics, standards, quality, and grade of Defendants' pex plumbing systems and their brass insert fittings;

    b.    Defendants' fraud and misrepresentation by omission, of information about the defective nature of their pex plumbing systems and brass insert fittings, the improper design of the products, and Defendants' knowledge of those defects, and

    c.    Defendants' concealment of the true nature of their defective plumbing systems

195.    Defendants and their agents and distributors also made untrue, deceptive, and misleading assertions and representations about their pex plumbing systems and their brass insert fittings by making the various statements about the alleged quality of the systems and brass insert fittings referenced throughout this Complaint.

196.    Plaintiff Charles Perrone's licensed plumber relied upon the untrue, deceptive, and misleading assertions and representations made by Defendants and described herein when deciding to purchase and install a Plumb-Pex system in Mr. Perrone's home.

197.    As a result of Defendants' untrue, deceptive, and misleading assertions and representations about their pex plumbing systems and brass insert fittings, Plaintiff and the putative Class have suffered actual damages in that they have purchased and installed in homes and structures a plumbing system that is defective and that is damaged the first time it is used.

198.    As a result of Defendants' untrue, deceptive, and misleading assertions and representations about their pex plumbing systems and brass insert fittings, Plaintiff and the

putative Class will suffer damages that include not only the full cost to replace their brass insert fittings and plumbing systems, but also include, without limitation, consequential and incidental damages.

199.     Plaintiff seeks to enjoin Defendants from engaging in untrue, deceptive, and misleading assertions and representations about the pex plumbing systems described herein.

## COUNT V

### (NEGLIGENCE)

200.     Plaintiff and the putative Class reallege the foregoing paragraphs, inclusive, as though fully set forth herein.

201.     Defendants were negligent in that they failed to use reasonable care when they created, marketed and sold their pex plumbing systems with F1807 brass insert fittings.

202.     As the manufacturer and / or seller of consumer products, Defendants owed a duty to Plaintiff and the putative Class to provide a safe and quality product, and a duty to provide a product that would perform as it was advertised.  Defendants breached those duties.

203.     That as a direct and proximate result of Defendants' negligence, lack of care, and other wrongful acts, Plaintiff and the putative Class sustained and will sustain damages.

204.     As a result of Defendants' negligence, Plaintiff and the putative Class have suffered actual damages in that they have purchased and installed in their homes and structures, or the homes and structures of their customers, a plumbing system that is defective and is damaged upon its initial use.

205.     As a result of Defendants' negligence, Plaintiff and the putative Class will suffer damages that include not only the full cost to replace brass insert fittings and plumbing systems, but also include, without limitation, consequential and incidental damages.

206.     That as a direct, proximate and foreseeable result of Defendants' negligence, Plaintiff and the putative Class members have been damaged, in the aggregate, in excess of $75,000.

## COUNT VI

### (NEGLIGENT FAILURE TO WARN)

207.     Plaintiff and the putative Class re-allege the foregoing paragraphs, inclusive, as though fully set forth herein.

208.     As the manufacturer and seller of a consumer product, Defendants had a duty to provide instructions for proper use of their products.

209.     As the manufacturer and seller of a consumer product, Defendants had a duty to warn of foreseeable dangers inherent in the proper use of their products and also had a duty to warn of dangers associated with foreseeable misuse of their products.

210.     Defendants became aware through various claims and reports that the brass insert fittings they were selling, distributing and advertising were subject to premature failures, problems and deterioration.

211.     Despite the fact that Defendants knew their product was defective and that their pex systems would not perform as advertised, warranted or otherwise expressly represented, Defendants continued to sell the products to the public without correction and, in fact, concealed from the public the fact that their pex system and brass insert fittings were defective, not durable and would begin to fail immediately upon being placed into service.

212.     Because the pex plumbing systems related to the habitability of persons' homes, Defendants had a duty to the consumer and to the public to disclose the defective nature of their

system and not to conceal and suppress the defective nature of the product from Plaintiff and the putative Class.

213.     Defendants, however, engaged in a scheme to cover up the true nature of the problem with their brass insert fittings and plumbing systems.  This scheme included the concealment of Defendants' marking as "confidential" their 2006 talking points memorandum which concedes that "the quality and design of the brass insert fitting used in the [Plumb-Pex system] does not measure up to Uponor's high quality standards."  This scheme also includes Uponor's attempts to keep information about its admissions of the defective nature of the fittings out of the public domain by trying to seal court files and by engaging in replumbing programs for some large home builders utilizing secured web sites and other methods of communication to preclude others from learning about the problems with the Plumb-Pex systems.

214.     To this day, Defendants continue in this pattern of concealment and suppression by deliberately and knowingly misrepresenting to the public the true nature of the problems with the brass insert fittings.  In fact, many members of the putative class are still unaware that their plumbing system is prematurely failing and will continue to fail due to its design and manufacturing defects.

215.     That to the extent Defendants claim in this lawsuit  -- contrary to their prior judicial admission -- that the premature failures of their plumbing systems and brass insert fittings was the result of characteristics of the water chemistry present in Plaintiff or the members of the putative Class's water supply, Defendants failed to warn of those characteristics or dangers.  As the manufacturer, seller and distributor of consumer products, Defendants had a duty to provide such information.

216.     That to the extent Defendants claim in this lawsuit – contrary to their prior judicial admissions -- that the premature failures of their plumbing systems and brass insert fittings was the result of characteristics of the water chemistry present in Plaintiff or the members of the putative Class's water supply, Defendants failed to provide Plaintiff and members of the Class with any instructions, information or warnings about the types of water conditions likely to cause premature failures.  As the manufacturer and seller of consumer products, Defendants had a duty to provide such information.

217.     That as a direct, proximate and foreseeable result of Defendants' failure to warn, Plaintiff and the proposed members of the Class suffered damage.

218.     As a result of Defendants' failure to warn, Plaintiff and the putative Class have suffered actual damages in that they have purchased and installed in homes and structures a plumbing system that is defective and that has caused damage to property other than the system itself and that is damaged upon its initial use.

219.     As a result of Defendants' failure to warn, Plaintiff and the putative Class will suffer damages that include not only the full cost to replace their plumbing systems and brass insert fittings, but also include, without limitation, consequential and incidental damages.

220.     That as a direct, proximate and foreseeable result of Defendants' negligence, Plaintiff and the putative Class members have been damaged, in the aggregate, in excess of $75,000.

## COUNT VII

### (NEGLIGENT MISREPRESENTATION)

221.     Plaintiff and the putative Class re-allege the foregoing paragraphs, inclusive, as though fully set forth herein.

222.    In making material misrepresentations of material facts regarding the characteristics and capabilities of their pex plumbing system through their advertising and product information and through their internet websites, Defendants knew or should have known they were misrepresenting material facts and that Plaintiff and the putative Class (and also Defendants' distributors and installers, and through them, Plaintiff and the putative Class), would be relying on Defendants' representations to their detriment and damage.

223.    In concealing material facts regarding the characteristics and capabilities of their pex plumbing systems, Defendants knew or should have known they were not disclosing material facts and that Plaintiff and the putative Class (and also Defendants' distributors and installers, and through them, Plaintiff and the putative Class), would be relying on Defendants' representations to their detriment and damage.

224.    Defendants made the material misrepresentations in the regular course of their business intentionally, recklessly or without exercising reasonable care in communicating the true characteristics and capabilities of their pex plumbing system, and / or with the intent that Plaintiff and the putative Class would rely on the false representations and purchase Defendants' pex plumbing systems.

225.    Plaintiff and the putative Class and / or their agents were unaware of the falsity of Defendants' representations, and as a result, they justifiably relied on them in purchasing Defendants' pex plumbing systems.

226.    That as a direct, proximate and foreseeable result of Defendants' failure to fully disclose material facts and Defendants' making misrepresentations of material fact, Plaintiff and members of the putative Class suffered damage.

227.     As a result of Defendants' misconduct, Plaintiff and the putative Class have suffered actual damages in that they have purchased and installed in homes and structures a plumbing system that is defective, that has caused damage to property other than the system itself and that is damaged upon its initial use.

228.     As a result of Defendants' misconduct, Plaintiff and the putative Class will suffer damages that include not only the full cost to replace plumbing systems and brass insert fittings, but also include, without limitation, consequential and incidental damages.

229.     That as a direct, proximate and foreseeable result of Defendants' negligent misrepresentations, Plaintiff and the putative Class have been damaged, in the aggregate, in excess of $75,000.

## COUNT VIII

## (BREACH OF EXPRESS WARRANTIES)

230.     Plaintiff and the putative Class re-allege the foregoing paragraphs, inclusive, as though fully set forth herein.

231.     Defendants made certain express warranties to distributors, plumbers and consumers about the goods they would provide.

232.     The express warranties provided by Defendants included warranties that Defendants would provide properly designed and manufactured plumbing systems and a lengthy warranty on such systems.  Defendants also made numerous other express warranties as previously set forth in this Complaint.

233.     Plumbing distributors, plumbers, Plaintiff and the putative Class relied upon Defendants' express warranties.

234.     Defendants breached such express warranties by providing defective plumbing systems that have or are reasonably certain to fail well before the warranted or useful life of the system.  Defendants also breached their warranties by refusing to honor their express warranties when presented with claims and damage covered by the terms of the warranty.

235.     Defendants also breached such express warranties by refusing to handle warranty claims submitted to them for failed Plumb-Pex systems and instead falsely stating that the "claim should not be sent to us" and should instead be sent to Unique Industrial or some other supplier of the fittings.

236.     Defendants also breached such express warranties by refusing to replumb Plaintiff Perrone's home and the properties of other members of the putative class.

237.     Plaintiff Perrone has provided notice of Defendants' breach of warranties via certified U.S. Mail to Uponor, Inc.

238.     That as a direct, proximate and foreseeable cause of Defendants' breach of express warranty, Plaintiff and the putative Class sustained damages, in the aggregate, in excess of $75,000.

## COUNT IX

### (BREACH OF IMPLIED WARRANTIES)

239.     All foregoing paragraphs are realleged here as if fully set forth herein.

240.     Defendants impliedly represented and warranted that their pex plumbing systems were free from defects, merchantable, fit for their intended purpose, and fit for the ordinary purpose for which such goods are used.

241.    It is the course of dealing and usage of trade in the plumbing industry to deliver fittings for plumbing systems that do not fracture, fail, or break under reasonably foreseeable circumstances and usage.

242.    The pex plumbing systems purchased by Plaintiff and members of the Class are subject to the implied warranty of merchantability, implied a warranty of fitness for a particular purpose, and implied warranty of course of dealing/usage of trade.

243.    At all times relevant hereto, including at the time of design, manufacture, and sale of the pex plumbing systems here at issue, Defendants knew of the particular purpose for which their plumbing systems were required and that Plaintiff and the Class were relying on Defendants' knowledge, skill, expertise, and judgment to select and furnish suitable goods for the particular purpose.

244.    Any purported limitation or disclaimer of any implied warranty is unconscionable and otherwise unenforceable under all circumstances since Defendants were aware of the tendency of their pex plumbing systems to fail well within the warranty period.

245.    Defendants breached applicable implied warranties because their pex plumbing systems contained and suffered from a defect that caused the fittings to fail, which then resulted in water leakage and damage to structures in which they were installed.  This defect was due to fundamental design, engineering, and manufacturing errors well within Defendants' area of experience and expertise and which sit present when Defendants' plumbing systems left Defendants' control and at the time of sale.

246.    Plaintiff and the Class are both direct and indirect beneficiaries of Defendants' implied warranties.  Plaintiff and other end-purchasers of Defendants' systems were intended recipients made by Defendants to distributors, builders, or other contractors.

247.    As a result of the foregoing, Plaintiff and members of the Class have suffered

damages in the form of replacement and repair costs that were directly and proximately caused

by the defects associated with Defendants' pex plumbing systems.  Moreover, if Plaintiff and

members of the Class had known the true facts about the defects in Defendants' plumbing

systems, they would not have accepted them.

248.    Plaintiff Perrone has provided notice of Defendants' breach of warranties via

certified U.S. Mail to Uponor, Inc.

249.    As a direct, proximate, and foreseeable result of Defendants' breach of implied

warranties, Plaintiff and the Class have suffered and will continue to suffer damages in excess of

$50,000.

## COUNT X

### (DECLARATORY AND INJUNCTIVE RELIEF)

250.    Plaintiff and the putative Class reallege the foregoing paragraphs, inclusive, as

though fully set forth herein.

251.    Pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure and any

applicable statute or rule providing for declaratory and / or injunctive relief, Plaintiff and the

putative Class seek a declaratory judgment as follows:

      a.    To the extent Defendants allege that any pretend limitations, restrictions or disclaimers of express warranty preclude full recovery of damages, the warranties fail of their essential purpose because the remaining remedies provided therein are inadequate and deprive the class of the benefit of the bargain of their purchases, because Defendants at the time of sale and thereafter concealed and suppressed that the systems were defective, and because the provisions are otherwise unconscionable;

      b.    To the extent Defendants allege that any pretend limitations, restrictions or disclaimers of express warranty preclude full recovery of damages, the same is unconscionable because the warranties do not provide adequate

remedies because the defect in the plumbing systems is latent and because the Plaintiff lack sufficient bargaining power;

c.  To the extent Defendants allege that any pretend limitations, restrictions or disclaimers of implied warranty preclude full recovery of damages, the same is unlawful and unenforceable;

d.  To the extent Defendants allege that any pretend limitations, restrictions or disclaimers of implied warranty preclude full recovery of damages, the same is barred by Defendants' failure to provide the alleged warranty disclaimers at the time of sale of the product;

e.  Any releases obtained by Defendants, that did not otherwise provide full compensation to the putative Class, were fraudulently induced, are unconscionable, were obtained by suppression and concealment, were obtained under duress by persons needing to repair their plumbing systems, and are null and void; and

f.  To the extent Defendants have had an adverse adjudication against them arising from the subject matter of this Complaint, that the putative class may use offensive collateral estoppel against Defendants for the rulings and determinations therein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of themselves and all others similarly situated, pray

for relief against Defendants as follows:

1.  Certification of this matter as a class action and appointing Plaintiff and his counsel to represent the class;

2.  Compensation for damages suffered by Plaintiff and the putative Class;

3.  Award of reasonable attorneys' fees and costs and disbursements incurred herein;

4.  Enjoin Defendants from denying warranty claims for failed brass insert fittings;

5.  Declaring the rights and obligations of the parties as prayed for; and

6.  Such other and further relief the Court deems just and equitable.

Dated:  January 20, 2011.

**ZIMMERMAN REED, PLLP**


By: <u>/s/ J. Gordon Rudd, Jr.</u>
J. Gordon Rudd (MN #222082)
David M. Cialkowski (MN #306526)
Brian C. Gudmundson (MN #336695)
651 Nicollet Mall, Suite 501
Minneapolis, MN  55402
TEL: (612) 341-0400
FAX: (612) 341-0844


**ATTORNEYS FOR PLAINTIFF AND THE
PUTATIVE CLASS**